## STEPHEN J. ABBOTT *versus* NATHANIEL MARSHALL.

A. having in his possession a horse belonging to a third party, sold him to P. by exchange for another horse, without disclosing his want either of title in, or authority to sell him. As between the parties, such concealment would render the sale fraudulent.

If A. had previously mortgaged the horse, and induced P. in ignorance of that fact, to purchase him by exchange for another, the trade, as between the parties, might be rescinded by P., who would be bound to restore the horse received by him, unless prevented by the rightful owner's taking the horse from him ; or, unless there were other circumstances in the case, that would excuse him from doing so.

And, if after such exchange, and before P. has discovered the fraud, A. mortgages the horse he received from P. to a third person, to secure only pre-existing debts and liabilities, (which are affected in no way but by being thus secured,) the mortgagee is not in the character of an innocent purchaser, for a valuable consideration, so as to set up title against the original owner of the horse.

Yet, if as an inducement and consideration for giving the mortgage, the mortgagee had agreed with A. to give him further time for payment of the debt due to him, and also agreed to pay certain notes where he was surety for A. and wait on him for re-payment, although there was no time of waiting specified, these facts will place the mortgagee in a new relation, so that he may be regarded as an innocent purchaser, not to be affected by the fraud of A. in the exchange of horses with P.

It being a well settled rule of law, that a vendee is not estopped to prove that there were other considerations, than those expressed in the written instrument, upon the same principle a mortgagee may be permitted to prove by parol evidence, an additional agreement, not disclosed by the mortgage and not inconsistent with it.

Whether by c. 126 of R. S., a person obtaining property by false pretences, is guilty of a *felony*, so that he cannot impart to an innocent purchaser a title against the former owner, is not an open question, where a case is presented upon a bill of exceptions, from which it does not appear that any request for instruction on that point was made at *Nisi Prius*, and the report of the testimony disclosed no false pretences on his part, .other than his having possession of the property, claiming and selling it as his own.

EXCEPTIONS from the rulings of KENT, J.

THIS is an action of TRESPASS, brought against the defendant, for the official act of one of his deputies, whilst he was sheriff of the county of York, in the taking of a horse, alleged

to be the property of the plaintiff. The writ is of the date of March 11, 1858.

At January term, 1860, the general issue was pleaded, with a brief statement, that at the time of the alleged trespass, the horse was not the property of the plaintiff, but was the property of one Lewis Pierce, from whom the horse was wrongfully detained; that the officer, under the direction of said Pierce, and by virtue of a writ of replevin, dated Feb'y 19, 1857, in favor of said Pierce against one James E. Abbott, took said horse and delivered him to said Pierce; that the writ was duly returned, and the action entered in this Court, and is still pending. And that the officer acted under the direction and by the command of said Pierce and as his servant.

From the bill of exceptions, it appears that, at the trial, it was proved that said Lewis Pierce was the owner of the horse mentioned in the plaintiff's declaration, from November, 1856, until the last of January or first of February, 1857; and that, during this time, he boarded the horse at the livery stable of James E. Abbott, a brother of the plaintiff; that the horse was known as the "Pierce mare;" that, in the latter part of January or first part of February, 1857, Pierce exchanged said horse with J. E. Abbott, receiving from him another horse, known as the "Warren horse," and paying to Abbott between thirty and forty dollars, as the difference in the value of the horses; that this exchange was made at the *Saco House*, neither of the horses being present and no writing of any kind being made. Delivery of both horses was proved. Both had been kept at Abbott's stable before the exchange, and remained there afterwards, until after the 5th day of February, 1857; that, on the second day of said Feb'y, said J. E. Abbott executed a mortgage bill of sale to the plaintiff of several horses, carriages, &c., including the horse in controversy, to secure the payment of several notes he held and to indemnify him against loss, as a surety of J. E. Abbott. There was no evidence of any consideration, other than the claims specifically described in the mortgage and in

the statements of the plaintiff, who testified that, before the execution of such mortgage bill of sale, he promised said J. E. Abbott, that, if he would give him such mortgage, he, the plaintiff, would pay the notes described in the mortgage on which he was surety, and wait for re-payment by J E. Abbott, until he would pay; and also, wait for payment of the notes described in the mortgage as payable to plaintiff until J. E. Abbott could pay them; that thereupon J. E. Abbott executed the mortgage to him, and he had paid the notes where he was surety, and had waited until the present time.

No new consideration was paid for the mortgage, and no responsibility or liability incurred other than such as is thus testified to by the plaintiff.

There was evidence tending to show, that the "Warren horse" was never the property of J. E. Abbott, but was the property of one Isaiah Warren of Fryeburg, who delivered him to J. E. Abbott on the 12th day of December, 1856, with the agreement, that when said J. E. Abbott should pay to said Warren the sum of two hundred dollars, the horse should become Abbott's property; but should remain the property of said Warren until such payment; that no such payment, nor any part of it, was ever made to Warren by said J. E. Abbott or any one else. There was counter testimony as to this sale.

It was also in evidence, that after J. E. Abbott received the horse of Warren he used him as his own; that, on the thirty-first day of December, 1856, he executed a mortgage bill of sale of certain property, including the "Warren horse," to one George W. Wiggin, which mortgage has never been paid or discharged; and the evidence tended to prove that, upon the exchange of horses with Pierce, J. E. Abbott made no disclosure of Warren's title to the horse or of the mortgage to George W. Wiggin, or of any want or defect of title in himself.

Upon the fifth day of February, 1857, J. E. Abbott left Saco, and soon after, the State, and has not since returned.

There was evidence tending to prove that, between the fifth

day of February, 1857, and the 19th day of the same month, Wiggin took possession of the "Warren horse," upon his mortgage bill of sale, and Warren, within a short time afterwards and before the said nineteenth day of February, took the horse upon a replevin writ, and has continued to hold him since.

The Judge instructed the jury that if they were satisfied that J. E. Abbott had no title in the "Warren horse" and no right, as against Warren, by license or otherwise, to sell him; if he did sell him by exchange to Pierce, without disclosing his want of title, that these facts would be sufficient evidence to justify the jury in finding that sale fraudulent as between the parties to it; and that, if there was a prior mortgage on the "Warren horse" by Abbott to Wiggin, and Abbott did not disclose the fact to Pierce, but induced him to purchase in ignorance of that fact, it might be sufficient ground for Pierce to rescind the trade as between the parties. But, in the latter case of the mortgage, he would be bound to restore the horse received, unless prevented from so doing by the fact that one having a superior title to both Pierce and J. E. Abbott, had taken the horse rightfully out of his, Pierce's, possession before rescission.

In reference to plaintiff's claim to hold the horse under his mortgage, if the sale or exchange was void or voidable between the original parties, the Judge instructed the jury that when a mortgage is given solely to secure pre-existing debts or liabilities, such debts or liabilities not being otherwise affected than by being thus secured, the mortgagee is not in the character of an innocent purchaser for a valuable consideration, and does not thereby acquire a right to set up a title, as such, against the original owner, if the title of his mortgager was void or voidable as against him by reason of his fraud in obtaining the property from the original owner.

But, if as an inducement and consideration for giving this mortgage, and before it was made, the plaintiff agreed with J. E. Abbott to give further time for the payment of the notes due to him, and also agreed to pay the notes where he was surety for him, and wait on him for re-payment of what

he should thus advance and pay, as stated by plaintiff, that these facts would place him in a new relation, and he might be regarded as an innocent purchaser, with all such purchaser's rights, and he would not be affected by the fraud, if any there was, in the sale or exchange between J. E. Abbott and Pierce; although no other particular time of such waiting was specified or agreed upon.

The verdict was for the plaintiff, and the defendant excepted to the instruction by the Court.

*T. M. Hayes,* in support of the exceptions.

The plaintiff's claim to the property in controversy is under a mortgage bill of sale, given to secure *antecedent* debts and liabilities. There is no evidence that the mortgage was ever recorded. Pierce was the unquestioned owner of the horse from November, 1856, to the last of January or first of Feb., 1857, and at one of the last named dates, he and J. E. Abbott went through the form of an exchange of horses, he nominally receiving from Abbott the "Warren horse" for the one in controversy.

At no time were there any *indicia* of title furnished by Pierce to J. E. Abbott. Abbott did not disclose his want or defect of title in the "Warren horse."·

I. The instruction that related to the right of Pierce to rescind the trade, and his duty to restore to Abbott the "Warren horse," was fitted to mislead the jury; and, upon the facts reported, was erroneous.

The general rule, as to return or tender of property received, may have other qualifications besides that stated in the instruction; and there may be other circumstances which will excuse a party from a return or tender of return. *Thayer* v. *Turner,* 8 Met., 558.

There could be no more complete restoration of the property to Abbott, than is shown by this case; for it still continued in his possession after the exchange. The instruction, therefore, must have led the jury to suppose that Pierce was bound to do something more by way of restoring the

Abbott *v.* Marshall.

horse than he did, or than it was possible for him to have done.

II. The other, and principal instruction is erroneous.

(1.) It virtually informed the jury that an innocent purchaser for a valuable consideration, of personal property, from one who had procured it from the true owner, by any species or degree of fraud, could hold it against such true owner.

It is conceded that this proposition finds an apparent support in numerous American cases, but it is believed to be contrary to sound reason, justice, and the established principles of a healthy jurisprudence.

For the general principle applicable to the law, *vide* Kent's Com., vol. 2, pp. 224–5 and note, (4th ed.); *Bradeen* v. *Brooks*, 22 Maine, 474.

The exceptions to the principle, Kent's Com., vol. 2, p. 225, note *b;* Broom's Legal Maxims, p. 354, (2d. ed.)

It has always been held that, if goods be stolen, no title passes from the felon to the *bona fide* purchaser. So, if goods are bailed for a particular purpose, but with power of sale, a transfer of them by the bailee confers no rights of property to a *bona fide* purchaser. Because the title of the true owner cannot be lost without his own free act and consent. And yet, by a somewhat refined species of logic, many American decisions apparently authorize the conclusion, that, if the thief or the fraudulent bailee procures one's goods in exchange for the goods stolen or bailed, the owner cannot reclaim them from the person who has purchased them *bona fide* from such thief or bailee.

It is difficult to perceive any good ground for distinction between these cases. The thief who steals a horse can confer no right of ownership upon a *bona fide* purchaser, because he has himself no such right. If, in exchange for the stolen horse, the *bona fide* purchaser delivers to the thief another horse, the thief acquires no more ownership in him than he had in the one stolen. The whole transaction is void. And so in the case of goods bailed for a particular purpose.

Such cases differ from those where some false representations or warranties have been made which authorized the party defrauded to rescind a transaction which, if not rescinded, will constitute a valid contract. This distinction, which is real, may not have been sufficiently noticed.

A distinction has been made between chattels *fraudulently* procured and those *feloniously* procured from the true owner. In *Dame* v. *Baldwin*, 8 Mass., 521, it was held that a sale by a person who had procured the goods *feloniously* "could not transfer the property. This distinction was recognized in *Ditson* v. *Randall*, 33 Maine, 202.

In the case at bar, the testimony tended to show that J. E. Abbott procured the horse from Pierce *feloniously.* He procured it in exchange for one that he had no title to, and upon which a prior mortgage existed, without disclosing either of these facts. This was an offence against § 1, c. 126 of our Revised Statutes, settled by *State* v. *Dorr*, 33 Maine, 448, and *Rex* v. *Henry Freeth*, 1 Crown Cases, (Russell & Ryan,) 127. Such an offence is *felonious* because punishable by imprisonment in the State prison. R. S., c. 131, § 9.

J. E. Abbott thus procured Pierce's horse *feloniously*, and the instruction of the Judge, that an innocent purchaser would not be affected by these circumstances, was erroneous. 14 Wend., 31.

(2.) This instruction is erroneous for another reason. It has been repeatedly decided that a fraudulent purchase of goods gives no title as against the vendor, and that such a purchaser's transfer of the goods to pay or secure a *bona fide* creditor for a pre-existing debt, will vest no title in the creditor. *Gilbert* v. *Hudson*, 4 Maine, 345; *Hawes* v. *Dingley*, 17 Maine, 341; *Buffington & al.* v. *Gerrish & al.*, 15 Mass., 156; *George* v. *Kimball*, 24 Pick., 241.

In the case at bar, the plaintiff claimed an interest in the horse in controversy, by virtue of the mortgage from J. E. Abbott. He has never paid anything, done anything, given up anything for the horse. He only claims to hold it as collateral security for debts due to himself before the execution

of the mortgage, and against his liability as surety for J. E. Abbott's debts due to others. Upon the payment of these debts, pre-existing debts, the mortgage would be canceled, and all the plaintiff's interest in the horse gone. There is not a mill of new consideration which would entitle the plaintiff to any claim upon the horse upon the discharge of these antecedent debts.

In *Gilbert* v. *Hudson*, 4 Maine, 345, it was held that, if a creditor attach goods fraudulently procured, for a subsequent and also for a prior debt, joined in the same writ, his lien on the goods, as against the party defrauded, extends only to so much of them as will satisfy the subsequent debt and costs.

Applying this principle to the case at bar, and what is there upon which the plaintiff can claim any lien upon the horse? The mortgage is to secure prior debts, nothing besides. The plaintiff assumed no new liabilities—he gave no *specific* time to J. E. Abbott during which he could not enforce his claims against him; and, if he did assume any new liabilities, the mortgage does not cover these. It is simply a mortgage to secure pre-existing debts, according to their original terms.

If any such talk was had between J. E. Abbott and the plaintiff as he states, it was *outside* of the mortgage and was no part of its consideration.

The instruction, if sustained, would extend a doctrine which has already stealthily advanced beyond the limits of good sense, and which some Courts are endeavoring to bring back to narrower limits. *George* v. *Kimball*, 24 Pick., 240–1; *Ash* v. *Putnam*, 1 Hill's N. Y. Rep., 306–7.

*S. W. Luques*, for plaintiff, replied.

The opinion of the Court was drawn up by

TENNEY, C. J.—This action is for a trespass, alleged to have been committed by the defendant's deputy, the defendant being at the time the sheriff of the county of York, in taking a certain mare, called the "Pierce mare," on a writ of replevin, in favor of Lewis Pierce against James E. Abbott.

The question raised by the pleadings, is whether the property, at the time of the taking, was so far that of the plaintiff that he can maintain this action, the defendant representing therein Lewis Pierce, who was once the undisputed owner thereof, and continued to be so, till the exchange made by him with James E. Abbott of the mare for a horse called the "Warren horse," in which exchange Pierce paid to Abbott the sum of thirty or forty dollars, the estimated value of the "Warren horse" over that of the Pierce mare.

A question of fact was presented at the trial, whether James E. Abbott, at the time of exchange, had purchased the "Warren horse" of Warren, the supposed owner, or whether he had only the right to use him and to purchase him, by paying within a time fixed a certain price. This question did not appear material, because, on Dec. 31, 1856, James E. Abbott gave a mortgage of the "Warren horse" to one Wiggin, who, according to the evidence, took possession thereof under said mortgage, between the fifth and nineteenth days of February, 1857; and that Warren a short time afterwards, and before the nineteenth day of February, 1857, took the horse upon a replevin writ, and has continued to hold him since.

In the exchange of horses made by Pierce and James E. Abbott, the latter disclosed no defect of title in him of the "Warren horse."

The plaintiff's right to the Pierce mare is under a mortgage thereof, with other personal property, dated Feb'y 2, 1857, from James E. Abbott, made after the exchange before mentioned, to be void on the payment of certain notes given by the mortgager, on which the plaintiff's name was as surety, and of notes holden by plaintiff against him. It was in evidence, without objection, that, before the execution of the mortgage, the plaintiff promised the mortgager that if he would give such a mortgage, he would pay the notes on which he was surety and wait for reimbursement of the money so to be paid, and also wait for the notes so holden against him, and, thereupon, the mortgage was executed and the plaintiff

had paid the notes on which he was surety and had waited until the time of the trial.

The case is presented to this Court solely on the instructions given to the jury. The first portion relate to the withholding, by James E. Abbott, of defects in his title to the "Warren horse" at the time of his exchange with Pierce. No error is perceived in these instructions, and they cannot be regarded as unfavorable to the plaintiff.

The jury were further instructed, that, when a mortgage is given solely to secure pre-existing debts or liabilities, such debts or liabilities, not being otherwise affected, than by being thus secured, the mortgagee is not in the character of an innocent purchaser for a valuable consideration, and does not thereby acquire a right to set up a title as such against the original owner, if the title of the mortgager was void or voidable as against him by reason of his fraud in obtaining the property from the original owner. This instruction was no ground of exceptions by the defendant. Upon the facts exhibited by the mortgage alone, it was as favorable to the defendant as the law will authorize.

The jury were further instructed, that if, as an inducement and consideration for giving the mortgage, and before it was made, the plaintiff agreed with James E. Abbott, to give further time for the payment of the notes due to him, and also agreed to pay the notes where he was surety for him, and wait on him for re-payment of what he should thus advance and pay, as stated by the plaintiff, that these facts would place him in a new relation, and he might be regarded as an innocent purchaser with all such purchaser's rights, and not affected by the fraud, if any, in the sale or exchange between James E. Abbott and Pierce, although no particular time of such waiting was specified or agreed upon.

It is insisted for the defendant, that no effect should be given to the parol evidence, as to the consideration of the mortgage, but that the rights of the parties should be confined to the facts as disclosed by the mortgage itself. This agreement is not inconsistent with anything in the mortgage;

and it is well settled by our law, that a vendee is not estopped to prove that there were other considerations than those expressed in the instrument. *Packard* v. *Richardson,* 17 Mass., 122; *Tyler* v. *Carlton,* 7 Greenl., 175; *Emmons* v. *Littlefield,* 13 Maine, 233.

A part, at least, of the consideration of the mortgage, if the evidence was believed by the jury, was the agreement touching the notes held by the plaintiff, and those on which he was surety. If, at the time of this transaction, the plaintiff had actually paid the notes, on which he was surety, and had taken notes of James E. Abbott for the amount paid, and also new notes for the direct indebtedness to him, to be paid at a time later than that fixed in the original notes, it cannot be doubted that this would be a valid consideration for the mortgage. And, if the holder of the notes on which the plaintiff was surety, had made a valid agreement with the principal to extend the time of payment without the knowledge and consent of the surety, the latter would be discharged, on the ground that he would, by such agreement, if still holden, be subject to a greater liability than he had assumed. It follows that, when he by a contract increased his liability, it was a consideration for the security given. The authorities cited sustain this position. Before the common law was changed by the statute, the payment of the part of a debt by the debtor, upon an agreement to discharge the balance, was held to be without consideration, but if time was given, it was otherwise.

It is incidentally mentioned in the defendant's argument, that it does not appear that the mortgage to the plaintiff was recorded. No question upon that matter is presented in the exceptions, and it does not appear that the mortgage was not recorded.

Again, the defendant invokes the principle as applicable to the facts of this case, that when property is obtained feloniously from another, the one so obtaining it cannot impart to an innocent purchaser a title against the former owner. And it is insisted that James E. Abbott obtained the Pierce

mare by false pretences, and that, having done so, he may be punished by imprisonment in the state prison. R. S., c. 126, § 1. And it is hence insisted that, by c. 131, § 9, he is guilty of a felony. Whether James E. Abbott would have been guilty of a felony, if convicted of having obtained goods by false pretences, we here give no opinion. But, upon the assumption of the defendant's counsel, in that matter, we think the point is not open to the defendant. The case finds, that James E. Abbott did not disclose any want of title in the "Warren horse" at the time of the exchange, but there is nothing, in the evidence reported, tending to show that he made any false pretences, but simply treated the horse in his possession as his own. The view now taken was not presented to the Court at the trial in any request for instructions, and we cannot assume that he did obtain the property in question by such unlawful means. · *Exceptions overruled.*

*Judgment on the verdict.*

APPLETON, CUTTING, GOODENOW, and KENT, JJ., concurred.